# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 5, 2010

## STATE OF TENNESSEE v. DERRICK JOHNSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 05-05455     James M. Lammey, Jr.,  Judge**

---

**No. W2008-02070-CCA-R3-CD  - Filed September 20, 2010**

---

A Shelby County jury convicted the Defendant-Appellant, Derrick Johnson ("Johnson"), of first degree premeditated murder and aggravated assault.  He was sentenced as a Range I, standard offender to life with the possibility of parole and a six-year consecutive term of imprisonment.  In this appeal as of right, Johnson argues: (1) the insufficiency of the convicting evidence as to the first degree premeditated murder; and (2) the trial court erred by imposing consecutive sentencing.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and J. C. MCLIN, JJ., joined.

Robert W. Jones, District Public Defender; Tony N. Brayton, Assistant Public Defender (on appeal), and Larry Nance (at trial), Memphis, Tennessee, for the Defendant-Appellant, Derrick Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark Bryan Thornton, Assistant Attorney General; William L. Gibbons, District Attorney General; David Zak and Lora Fowler, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

**Facts**.  The facts of the case, in large part, are not in dispute.  Johnson concedes that he shot and killed the victim, Eric Mattison; however, Johnson contends that it was in self-defense.  In short, Johnson and the victim had an altercation the day before the offense because Johnson was apparently blocking neighborhood traffic.  The next day, the day of the

offense, Johnson saw the victim again and maintained, based on events that occurred the day before, that the victim attempted to shoot him. Consequently, Johnson retrieved a firearm and shot at the victim and his girlfriend. The following detailed proof was presented at trial.

Rene Mattison, the victim's mother, testified that the victim lived with her prior to his death. She confirmed that on July 19, 2004, the victim was shot and died a few days later as a result of his injuries.

On the morning of the offense, Patricia Turnmire, a crime scene officer with the Memphis Police Department, responded to 4164 Kostka at the Lakeside Down Apartments in Memphis, Tennessee. Upon arrival she was advised that there had been a shooting and the victim had already been transported to the hospital. She observed the victim's vehicle, a white Oldsmobile Intrigue, and stated that it was heavily damaged. She described the vehicle as having been struck several times by gunfire. She, along with her partner, collected numerous .45 caliber shell casings and a few bullet fragments. Although a .25 caliber handgun was recovered from inside of the vehicle, there were no shell casings from this type of weapon recovered from the scene. Turnmire also noted what appeared to be blood inside of the vehicle. At a minimum, Turnmire stated the vehicle had been shot into eight (8) times. Both airbags deployed. The back windshield had been shot out. She recalled finding the .25 caliber handgun in inoperable condition.

On the morning of the offense, Kimberly Mayes, the victim's girlfriend of eight years, drove him to a friend's house in the Lakeside Down Apartments. Upon arrival, they did not see the friend's car and realized the friend was not there. When Mayes "backed up to leave," she saw Johnson, whom she only knew as "Dirty D". "He was like at the edge of the garbage can, pointing a gun at [her] car. He began shooting in [her] car." Mayes tried to duck and drive her vehicle; however she hit another parked vehicle with children in it.

After Mayes wrecked her vehicle, Johnson continued to shoot. Mayes said the victim "jumped out [of] the car over [her] on the driver's side out the door." She stated that at this point, she had not been shot and did not believe the victim had been shot. She also stated that the victim did not have or shoot a weapon. When she got out of the vehicle, she saw the victim lying on the ground and went to get help. She attended the victim's funeral two days later.

Mayes stated that she knew Johnson "from around . . . the neighborhood. [They] all grew up in the same neighborhood." Mayes spoke with the police that day and identified a photograph of Johnson as the person who shot the victim. Mayes was shown a photo array at the police station the next day and again identified Johnson as the perpetrator of the offense.

The day before the victim was killed, Mayes and the victim were at his mother's home. Mayes recalled that Johnson was "blocking the street trying to talk to some young lady . . . and [the victim] asked him to move the car out of the way[.]" Johnson would not move and the victim got out of their vehicle and approached Johnson's vehicle. Mayes stated, "They had little words – not even a big argument about blocking the way. I got out of the car. I was like, 'What's going on?' He replied to me, 'There's nothing going on. You don't have to worry about anything. I'm not going to get myself killed over anything.'" She described the encounter as "nothing" and stated they left afterwards.

On cross-examination, Mayes denied seeing Jackie Guy or conducting a "transaction" with her on the morning of the killing. She said she took the victim's money, approximately $700, and his watch from his person after the shooting. However, when confronted with a statement she had previously given to the police, she clarified that she was "leaving from . . . in front of Jackie's house" and that she initially told the police that she did not take anything from the victim's person. She explained that she "wasn't thinking" at the time she gave the statement.

Lieutenant Doreen Shelton testified that on the day of the offense she was working as a sergeant with the Memphis Police Department Homicide Bureau. She responded to the crime scene and observed that the gun recovered from the victim's vehicle "had a double seed, meaning that possibly the weapon had one round already in the chamber ready to fire, and the person jacked the weapon - pulled the slide back very fast, which caused another round to go up, but the ejection pin did not eject the first round for some reason, and it just would not operate that way." She was also part of the team that interviewed Johnson following his arrest on November 20. She explained that Johnson completed an advice of rights form and gave a written statement "basically confess[ing] to the shooting." The statement was in question and answer format and provided, in pertinent part, the following:

QUESTION: On Monday, July 19th, 2004, Eric Mattison was shot and killed at 4164 Kostka. Are you the person responsible for his death?

ANSWER: Yes, ma'am.

QUESTION: What did you use to kill Eric Mattison with?

ANSWER: A black handgun - .45.

QUESTION: How many shots did you fire at Eric Mattison?

ANSWER: I think it was nine. There was one in the chamber and eight in the clip because the gun was empty.

QUESTION: Do you know where, on Eric Mattison's person, that he was hit?

ANSWER: No, ma'am.

QUESTION: What did you do with the gun after this incident?

ANSWER: I passed it off to a junkie.

. . . .

QUESTION: In your own words, tell me what happened before, during, and after the shooting.

ANSWER: On the 18th of July, I was riding through the Brookwood Apartments with one of my partners by the name of Keith Dear, and I stopped to talk to a girl, and a car pulled up. It was a white Alero, and the girl asked me would I move and let her by. So, I had told them that I would move, but the person who was in the car with her stuck his head around her head and started talking crazy like I needed to move out of the mother-fucking way.

So I realized who it was, so I told him to 'Stop playing, Little E'; and he was like, 'I ain't playing with you, bitch-ass nigger. I told you to move that shit out of the way.' So, I pulled the car up, turned around to leave the apartments, he jumped out of the car from the passenger side, and he was telling his girl to pop the trunk, but she wouldn't pop the trunk, so he went around to the driver's side and popped it himself.

When he popped the trunk, he had a gun in his hand. I don't know what kind it was, but it looked like a nine or a .380. He told me I needed to get my bitch-ass . . . up out of the apartments.

So, another van pulled up on my driver's side and asked, him, 'What is up, cuz?' He was like, 'Man, this bitch-ass nigger needs to get up out of the apartment, and he needs to leave now.' He was like, 'You need to leave right mother-fucking now.' So, we left, me and the car that was following me, which was Keith Dear. He was driving a white '90 Fleetwood. He left the

-4-

apartments and went to the Oakshire Apartments, and we like chilled out for a minute or two later on that day.

I had went to the Colonial Apartments on Airways, and as I was leaving the apartment, some shots were fired, and they chased me down Airways. I has - has [sic] ran the light. I has - I has [sic] went to Bethel Grove on Lamar and Sims to my uncle's house for the rest of the night.

The next morning, which was the 19th of July, I has went [sic] to the Lakeside Downs Apartments, and I had got dropped off and was supposed to be over at a girl's house, but she wasn't home at the time. So, I sat on the stairs in front of her house. Then I saw a white Alero pull in, and he seen me sitting on the steps. He pulled up a gun and pointed it at me, so I ran around the corner and got a gun from somebody. By the time I came back, the car was coming, so I started shooting at the passenger, and she pulled off and hit a truck - an SUV.

When she hit the SUV, I ran back up and fired more shots and ran. I ran into another one of my partner's mother's house and told them, 'I think I killed somebody.' We had went to the Southern Hills Apartments and I gave the gun to a junkie and told him to get rid of it.

. . . .

QUESTION: What time of day did Eric confront you on July 18th, 2004?

ANSWER: It was daytime, somewhere like 4:00 o'clock P.M.

. . . .

QUESTION: How far away were you from the vehicle [the victim] was in when you shot the .45?

ANSWER: I was right up on the car.

. . . .

QUESTION: Describe exactly what the white vehicle that the victim was in was doing when you opened fire.

ANSWER: They was speeding around the corner as if he was going to let off some shots or something and keep going. So, I pulled my gun out that I got from my friend and started shooting at the passenger, which was Eric.

. . . .

QUESTION: When you saw Eric pull into the apartments, why did you go get a gun?

ANSWER: Because I know that he would do something crazy and try to kill me.

Francis Carpenter, a retired crime scene unit investigator, testified that he processed the vehicle in this case. He stated that he recovered five projectiles or parts of bullets that actually hit the vehicle.

Special Agent Cervinia Braswell, a forensic scientist with the Tennessee Bureau of Investigation (TBI), testified as a firearms and ballistics identification expert. She analyzed the .25 caliber handgun recovered from the victim's vehicle. She stated, "the bullets from this gun . . . did not fire the bullets that I have because the land and groove measurements and the bullets themselves are not compatible." She explained that the bullets she received were compatible with a ".45 auto bullet." Agent Braswell received six bullets or bullet fragments to examine and testified that four of them were an exact match. Of all the items Agent Braswell examined, none were consistent with being shot from a .25 caliber handgun.

On cross examination, Agent Braswell stated that she was not asked by the State to conduct a fingerprint analysis on the .25 caliber handgun recovered from the victim's vehicle. She further explained that the .25 caliber handgun was in operable condition upon receipt. Although she could not conclusively determine if two of the projectiles recovered from the crime scene were fired from the .25 caliber handgun, she clarified that it "could have been fired from that gun." Finally, she did not know whether the victim's hands were "bagged" for gunshot residue testing.

The Memphis and Shelby County Chief Medical Examiner also testified, reviewed the autopsy report, and determined the victim's cause of death to be "multiple gunshot wounds, and the manner of death is homicide." She detailed the victim's wounds as follows: "There is noted a gunshot wound on the right side of the chest. Another gunshot wound on the left side of the back. And these two wounds are actually connecting wounds. That is they resulted from a bullet that entered on the right side of the chest and exited on the back of the left side of the chest." She also noted a gunshot wound just above the right knee and another gunshot wound on the victim's left side of his forehead. Finally, she explained that a

toxicology report determined that the victim had breakdown products of marijuana and cocaine in his blood.

On cross-examination, the Medical Examiner stated that the injury to the chest involved "several vital organs, and in and of itself would have been a fatal wound." She stated the autopsy report did not include any notations indicating that the victim's hands were bagged for gunshot residue testing. She further clarified that the victim had used marijuana near the time of his death and likely used cocaine within the previous twenty-four hours prior to death.

Sergeant Anthony Mullins with the Memphis Police Department Homicide Bureau responded to the crime scene location and was the case coordinator. He interviewed Kimberly Mayes and developed Johnson as a suspect. When he showed Mayes a photo of Johnson, "she immediately broke down into violent sobbing, yelling - 'That's him, that's him.'" Sergeant Mullins could not recall whether he asked for a gunshot residue test to be performed on the victim's hands. He explained, "there are occasions when hands are cleaned prior to the medical examiner's office obtaining the body. If that's the case, there's too much of a possibility for contamination. In this particular case, I didn't have any indication that [the victim] fired any shots . . ." He clarified on cross examination, "If I make the scene, and the body has already been placed in a bag at The Med, I can't - I'm not necessarily going to get the hands bagged [for gunshot residue testing]."

Sergeant Mullins also explained that, initially, he had another suspect who also had the first name "Derrick". However, he did not conduct any follow-up investigation on this person nor did he provide a picture of this individual in a photographic line-up for viewing.

The defense proof consisted of the following. In July 2004, Jackie Guy lived at 2105 East Raines. She testified that she telephoned the victim on the day of the offense. He came to her house accompanied by his girlfriend, Kimberly Mayes. Guy further stated that they parked at her backdoor "front-in." She described the following:

> I got-came over and got in the car, and we talked awhile, and I got out of the car, and I started waiving bye-bye like, "I'll see you later." I did glean someone going behind the garbage can, and as I went in the house-it wasn't sixty seconds later, and I heard like two or three gunshots, which I thought it was some firecrackers. And I heard a boom-I guess it was the car impound [sic], you know. I said, "What was that?" Then I hea[r]d two or three more gunshots. That's when I went to my backdoor, and I saw a lot of peoples running around the curb . . . and I saw [the victim] in the street.

Guy testified that the reason she got in the car was to buy some crack cocaine from the victim, Eric Mattison. She said she paid him $10.

Johnson testified that in July of 2004 he lived with his mother on Weaver Road in Memphis, Tennessee. He admitted that he had been previously convicted of various offenses including possession of a prohibited weapon, two felony convictions for theft of property, and criminal-attempt aggravated robbery. Johnson explained that on July 18, 2004, the day before the offense, he went to Lakeside Down Apartments. The confrontation began as Johnson was parked "like in the middle of the street" trying to get a girl's telephone number. The victim and Mayes pulled up in their car, Mayes asked Johnson to move his car, and Johnson attempted to comply. By the time he had straightened out his car, the victim had gotten out of his car, removed a firearm from the trunk his car, and threatened Johnson by saying "Yeah, Bitch, I think you need to move this car out the way." Although Johnson did not observe the caliber of the firearm the victim had, he described it as a small silver handgun. He identified the .25 caliber firearm recovered from the victim's vehicle on the day of the offense as the same firearm the victim had during this altercation.

Johnson said Mayes got out of the car and told the victim to get back in the car because it was "not that serious." At this point, Johnson observed another individual, possibly the victim's cousin, pull up in a brown van, blocking his way out of the apartments. Johnson testified that after the victim had a conversation with the person in the brown van, the brown van ultimately moved, and Johnson left the apartments. Later on that same night, Johnson said that someone in the same brown van fired five or six shots at him.

The next morning, Johnson had his uncle drop him off in the Lakeside Down Apartments. He said he was going to visit a girl who lived at 4180 Kostka. While he was waiting on the girl's porch, he observed the victim and Mayes's car. Johnson said the victim saw him, retrieved a firearm, and attempted to shoot him. He ran around the building and saw "somebody standing out there that [he] was familiar with" and asked for a "unit" or a gun. This person went inside a house, retrieved a gun, and gave it to Johnson. Johnson testified, "once I got the gun from him, I stuck the gun aside my waist. I didn't go get the gun with on my mind is, 'I'm fixin' to go do something to somebody.' I just wanted to protect myself and make it up out of those apartment complex safe without this person doing harm to me."

Johnson walked down Kostka Drive and attempted to leave the apartments. He saw Mayes and the victim in the car. Through the window, he observed the victim "reaching for that firearm." He said he feared for his life and his safety, pulled a gun out, and fired three shots through the windshield of the car. He denied intending to hurt Mayes. After firing the gun, Johnson said the victim proceeded to get out of the car. Johnson ran back to the car and fired more shots into the victim's car. Johnson said the victim chased him as he ran out of the

apartment complex. Although his statement to the police was not as detailed as his trial testimony, Johnson conceded that it was "about what [he] told them[.]"

On cross-examination, Johnson admitted that he signed his statement; however, he denied ever having read it. He explained that when he came to jail, he could not read. Johnson further stated that "it didn't take [the person who provided him with the gun] a matter of a second to come back out the door and give [him] that firearm. He went straight into the house. It's like he had a gun somewhere real close by."

Keith Dear, a friend of Johnson's, corroborated Johnson's testimony regarding the events that occurred on the day before the offense. He was "just riding around" following Johnson in his car and talking to girls. He saw the victim get out of the car, open the trunk, and retrieve a gun. He said the victim was arguing with Johnson, and they later left the apartments.

In July 2004, Earnestine Davison was employed with the Memphis Police Department Homicide Bureau. She spoke with Mayes as part of her role in the investigation of the victim's death. She recalled that Mayes told her that the she and the victim saw "Jackie" on the day of the offense. She also said that Mayes had previously advised that the victim had been laid off from his employment for a year.

Johnson was convicted as charged. He received a life sentence plus six years in the Tennessee Department of Correction. This timely appeal followed.

**I. Sufficiency of the Evidence.** Johnson argues the evidence is insufficient, as a matter of law, to support a verdict of guilt beyond a reasonable doubt to the charge of first degree premeditated murder, but instead only supports a verdict of voluntary manslaughter. The State contends any rational juror could find that Johnson intentionally and with premeditation killed the victim. We agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, this Court must consider "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 442 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." The requirement that guilt be found beyond a reasonable doubt is applicable in a case where

there is direct evidence, circumstantial evidence, or a combination of the two.  State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977) and Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).  The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence.  State v. Odom, 923 S.W.2d 18, 23 (Tenn. 1996).  When reviewing issues regarding the sufficiency of the evidence, this Court shall not "reweigh or reevaluate the evidence."  State v. Philpott, 882 S.W.2d 394, 398 (Tenn. Crim. App. 1994) (citing State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978), superseded by statute on other grounds as stated in State v. Barone, 852 S.W.2d 216, 218 (Tenn. 1993)). This Court has often stated that "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997) (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict."  Id. (citation omitted).

Tennessee Code Annotated section 39-13-202(a)(1) defines first degree murder as the "premeditated and intentional killing of another."  Premeditation is defined, under subsection (d), as follows:

> As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment.  "Premeditation" means that the intent to kill must have been formed prior to the act itself.  It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.  The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

T.C.A. § 39-13-202(d) (2004).  A person's actions are "intentional" if it is the person's "conscious objective or desire to . . . cause the result."  T.C.A. § 39-11-106(a)(18) (2004).

The Tennessee Supreme Court has stated that "premeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment' as required by Tennessee Code Annotated section 39-13-202(d)."  State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003).  The Court identified the following factors as supporting a finding of premeditation:

> the use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's

procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness immediately after a killing.

Id. (citing Bland, 958 S.W.2d at 660). These factors, however, are not exhaustive. Id. The trier of fact may also consider evidence of the defendant's motive and the nature of the killing. State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998).

We hold that the evidence, when examined in the light most favorable to the State, was sufficient to support the jury's finding that Johnson's actions were premeditated and intentional. Johnson claims, "There was proof that [the victim] provoked appellant by threatening him the day prior to this incident and perhaps shooting at or causing someone else to shoot at appellant [the day before the offense]." We disagree. After hearing all of the facts and circumstances surrounding the killing, the jury, as was it's perogative, rejected Johnson's self-defense theory. As previously stated, it is not the function of this court to re-weigh or re-evaluate the proof presented at trial. Accordingly, we conclude, upon our review of the record, that a rational juror could find that Johnson intentionally and unlawfully killed the victim beyond a reasonable doubt. Johnson is not entitled to relief on this issue.

**II. Sentencing.** Johnson contends that the trial court erred in ordering "his sentences to be served consecutively by finding [him] to be a dangerous offender." In response, the State argues that the trial court properly imposed consecutive sentencing based on the facts of the case as well as Johnson's extensive criminal history. We agree with the State.

On appeal, we must review issues regarding the length and manner of service of a sentence de novo with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d) (2006). Nevertheless, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The defendant has the burden of showing the impropriety of the sentence. Sentencing Comm'n Comments, T.C.A. § 40-35-401(d) (2006). If the trial court followed the statutory sentencing procedure, made adequate findings of fact that are supported by the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the sentencing act, this court may not disturb the sentence even if a different result was preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). Because the trial court properly considered the purposes and principles of the sentencing act pursuant to sections 40-35-102 and -103 and all relevant facts and circumstances, our review will be de novo with a presumption of correctness. In conducting our de novo review, this court must consider:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b) (2006); State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008).

Where a defendant is convicted of one or more offenses, the trial court has discretion to decide whether the sentences shall be served concurrently or consecutively. T.C.A. § 40-35-115(a) (2006). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the seven categories in section 40-35-115(b) (2006). An order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense." T.C.A. § 40-35-102(1) (2006). In addition, the length of a consecutive sentence must be "no greater than that deserved for the offense committed." T.C.A. § 40-35-103(2) (2006).

Here, the trial court imposed consecutive sentencing because it determined that Johnson was a dangerous offender based on the facts of the case as well as his criminal history. The trial court considered Johnson's criminal history and concluded that he "has a previous record of violence-violent crimes." T.C.A. § 40-35-115(b)(1), (2) (2006). This court has held that "[e]xtensive criminal history alone will support consecutive sentencing." State v. Adams, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997) (citing State v. Chrisman, 885 S.W.2d 834, 839 (Tenn. Crim. App. 1994)).

After reviewing Johnson's criminal history, the trial court stated:

I do also find that Mr. Johnson is a dangerous offender. If you look at the offense of this particular case, a person that did this - the actions that he was

-12-

convicted of in this particular case shows no regard for human life. It shows a total disregard for humanity, as far as I'm concerned. And just basing it upon the facts of this particular case, I find he is a dangerous offender.

Furthermore, he has a previous record of violence-violent crimes. He is definitely a dangerous offender. So, because of that, I'm going to order that these be run consecutive to one another for a total of life plus six years in the Tennessee Department of Corrections.

We conclude that the trial court did not err in requiring Johnson to serve his sentences consecutively. A finding of any one of the factors in section 40-35-115(b) can justify the trial court's imposition of consecutive sentencing. The record on review shows that the trial court properly found by a preponderance of the evidence that Johnson was an offender "whose record of criminal activity [was] extensive." T.C.A. § 40-35-115(b)(2) (2006). At the sentencing hearing, the trial court reviewed Johnson's criminal history, which consisted of prior convictions for attempted aggravated robbery, numerous assaults, possession of a prohibited weapon, and several other drug and theft offenses. Accordingly, upon our de novo review with a presumption of correctness, the trial court's judgments are affirmed.

## CONCLUSION

Upon our review, the evidence is sufficient to support Johnson's conviction for first degree premeditated murder and the trial court properly imposed consecutive sentencing. Accordingly, the judgments of the trial court are affirmed.

_____

CAMILLE R. McMULLEN, JUDGE